and I represent the appellate Wayne Morgan. I'd like to begin with point two which concerns the application of the attempted murder guideline in this case. We argue that this case did not show that Wayne Morgan acted with premeditation and deliberation, the intent necessary for first degree murder when he will be a victim too. That the evidence is more consistent with him having acted under conditions of a sudden crawl or in the heat of passion which would be a manslaughter and fall under guideline section 282.2 which has a base offense level of 14. So how do you account for the telephone conversations that I think were either two or three weeks later and he's talking about what he did and at the very least it clarifies his intent. No, Your Honor, because for first degree murder he would need to have acted in premeditation which means he had to not only have acted with a cool head that was capable of reflection at the time but there also had to be some appreciable time for him to reflect and consider where he was going. Isn't that appreciable time depicted in the video that shows that after the interaction he went inside an apartment, retrieved a gun from the co-defendant, waited, went inside, retrieved a gun, came out, went out a different exit so as not to presumably be detected. I mean intent can be formed. Typically jurors are instructed generally two things. Intent can be formed in a murder case or attempted murder instantly and two, it can be derived from circumstantial evidence. We instruct jurors that you can't get into someone's mind and therein determine their intent and that you do so by circumstantial evidence. So isn't the circumstantial evidence in this case very strong to show that your client took the time to go and retrieve a gun and to hide it and to come out a different exit and to confront and then chase one of the victims while shooting him in the back? I mean how is that not? No, Your Honor, because this isn't, that may be enough for second degree murder but for this guideline you have to establish first degree murder. Why is that? Because that's what the guideline provides. It's first degree murder which is 18 U.S.C. 1111 and that requires premeditation. The video evidence is just three minutes long. It's just three minutes from start to finish and the judge broke it down frame by frame but if this were a manslaughter, which we say it is, where a person acts on a sudden quarrel or he's acting, the same could be said. Section 1111 is not a first degree murder statute. It's a murder statute. It says murder is the unlawful killing of a human being with malice aforethought. Then it goes on to talk about every murder that is deliberate and premeditated is first degree. All other murder is second degree. This is classic common law murder. Malice aforethought doesn't mean aforethought. That was established in like the 12th century. Premeditation comes into play in like the 18th century and by the end of the 19th century you have judges saying that no time is too short for an evil man to premeditate and so that whole distinction starts to break down. But whatever way it is, intentional killing not qualifying for the manslaughter defense is murder and premeditated, whatever that means, is first degree murder. Here at least it's second degree murder. There's no question. Premeditation does mean something and the guidelines provide this guy with first degree murder for the base office level to be 33. And there is premeditation. There has to be some appreciable time. Three minutes is not an appreciable time to think I'm going to kill this guy. I'm going to, I'm going to, how am I going to do it? I'm going to go to my friend's apartment and borrow his gun. Why isn't that a plan? That's the same thing as if he. It's not quite the same thing as the guy says suck my dick. Oh my God, he really means he's going to sexually assault me, whip out the gun from my pocket and shoot him. That conceivably is manslaughter. He didn't do that. He did something very close. He went to, the co-defendant lived on the first floor of the apartment. He walked a few steps to the front of the building to the co-defendant's apartment and when the co-defendant answered the door, I don't know what he talked about, but he went inside. But everything happens within three minutes. Three minutes from him leaving the front of the building, knocking on the co-defendant's door, and then when he goes outside, he doesn't immediately shoot the person, victim two. He's warping himself up because he's agitated, he's in this agitated state. And he, only after a few seconds, then he starts to fire. And it looks like he shot victim one unintentionally because that's the co-defendant's nephew, the co-defendant who supplied the gun and loaded the gun for him. But this happens in a very short period of time. Mr. Morgan is very mentally ill and his condition was exacerbated because this was the beginning of the pandemic, the first five months. He couldn't, he stopped getting his medication. All his treatments stopped. He had no in-person treatment. All he did was get phone calls telling him to self-isolate. So in that time, there's a three-minute period where he snapped. There's no evidence of him doing anything before that three minutes. Well, wasn't there evidence? There was some evidence that he had, that he had concerns about these two individuals, particularly the victim that he chased and ultimately shot in the back, that prior to this date, he had concerns that they may, that he may sexually assault him. And undoubtedly, your client had, unfortunately, a very terrible history of being a victim himself and mental illness. All of that may explain why things occurred the way they did that day, COVID, et cetera. But there was, he was already sort of concerned about these two individuals and the one individual in particular because of some interaction they had previously. Or am I misreading the record on that? No, he apparently did have some concerns. I think that's what comes out in some of the COVID phone calls. But there's no evidence to plan anything with COVID in the wild. Well, I mean, I guess what I, I mean, we are, we are, I mean, I personally wouldn't find premeditation on these facts, at least based on the cold record, which is thankfully not my job. My job here is to decide whether there was sufficient evidence to justify the district court in finding by a preponderance of the evidence that there was premeditation. Now, do you, have you cited any case in which it was held under Section 1111 that a jury was not permitted to find premeditation beyond a reasonable doubt because the time for premeditation was only three minutes? This is the time not for the premeditation. This is the entire event happening within three minutes. He knocked on the COVID fitness door for one minute and was in there for about, for about a minute. So it's a couple of minutes, but it happens very fast. If, if he just, if a person just snaps in a quarrel and has a quarrel with someone and he had a passion, acts on it, he doesn't have a gun himself, but he knows a guy a few steps away who has a gun. And he acts and he does all this within, and the time just lasts three minutes. It just takes three minutes. Yeah, so my question is, in a case like, do you have a case like that where it was held that that is insufficient time for premeditation when the question is could a jury find it beyond a reasonable doubt, let alone could a judge find it by a preponderance of the evidence? No, I haven't looked for such a case. Yeah, well, I think you won't find them, and I think you'll find them saying the opposite because that was what premeditation came to mean over the course of time. I mean, what you're, what you're looking at in the federal statute for first degree murder is an antiquated concept, but it's one that is still applicable in many states, and there are people going to the death penalty on findings of premeditation that are no stronger than this. But this case is like a person pulling a gun out of his pants pocket because he's just walking from the front of the building to the apartment of the co-defendant who is very close by. But I think the point of those cases, for example, in self-defense, you know, you have, you don't have self-defense, which is in essence what he's claiming here, self-defense from a perception that he's going to be sexually assaulted. No, he doesn't have self-defense. But in self-defense cases, in some states, you have the duty to retreat. And if you leave, you have the mindset to think this is a bad idea. Okay, I'm mad I'm going to get a gun, but this is a bad idea. You don't go forward and get the gun and wrap it in a T-shirt and run out and come out the building from a different door to surprise the people that you are frightened of or scared of and then shoot them in the back. I mean, these are all things that go to intent. Yes, Your Honor. We argue that the evidence shows that his intent was more like a voluntary manslaughter. I'll briefly, can I briefly speak about the amended indictment issue? This is an unusual case in the sense that not only the initial indictment that was filed and the superseding indictment both give a date of March 8, 2020, when this incident occurred. The indictment was amended by the government during the precinct report by saying that the incident occurred on August 31, 2020. What was the prejudice? The prejudice would be that it's unclear from the record that what happened on August 31, 2020, which is what the attempted murder was based on, videotapes, taken August 31, it's unclear whether from the record whether what the grand jury voted on is occurring on March 8. It's unclear from the record. The prejudice is it's unclear that that's the way out on August 31 is related to the conviction, to the grand jury filed against Mr. Morgan from March 8, 2020. How is it unclear when they reference the shooting in the allocution? Unless your client was charged with some other shooting, how is it unclear? I mean, I understand it is troubling that the complaint had the correct date and then there is an indictment that has the wrong date. I get that, and those are good questions for your opposing counsel. How could you get it wrong and get it wrong twice? But certainly by sentencing, that's when the government said, oh, you know, that March date is wrong. It's really August. But in terms of the allocution, when your client actually pled guilty and there was a reference to the shooting, are you saying he didn't know that the possession, that what he was pleading to, possession of ammunition was related to, not related to this incident, to the shooting, when they talked about the shooting and the victims and what happened? I'm saying that the record is unclear. When he pled guilty, he just pled guilty. He just says, in March 2020 in the Bronx, I had ammunition and I was previously convicted, convicted felon, and I know I have, I know having ammunition is wrong, and I'm sorry for it. So let me try and clarify. The Pimentel letter didn't have a date on it, but the Pimentel letter described what had happened. And I think his counsel confirmed that he'd been given a copy of it and read it. It was clear that he had access to it. So he knew then at the time of his plea and sentencing that what he was in the dock for was the shooting. Yes. Our position, the Pimentel letter isn't a pleading. It's just the government's position about what the guideline range would be. It's not a, he doesn't have a plea agreement. It's not a pleading. The thing that's so unusual about this case. Are you making, is it your position that he, in entering this plea, could possibly have thought that he was pleading to an incident that happened in March as opposed to August? The record isn't clear on what he thinks. He's pleading guilty if something happens in March 8th, 2020, when apparently the only thing that happened that I know of in this case happened on August 31st. But what I believe is not, is not by record. There were two pleadings, two grand juries came up with this March 8th, 2020 date. And it's not like the typographical error, like in the pre-sentence report is a typographical error. It says January 2021, when it should be January 2022. But this isn't. Are you arguing it's effective reallocution? Are you arguing constructive amendment? Are you arguing both? I'm arguing that the indictment was amended. And if you are going to sentence or prosecute him for August 31st, 2020, then the record is not clear that he knew what he was doing. Well, normally when you have a constructive amendment, you are comparing the proof, or in the case of a plea, what the plea is to, with the indictment, with the charging instrument, right? Right. But here, the proof in the form of the allocution matches the indictment. Yes, it does. He's charged with possessing ammunition on March the 8th, and he admits to possessing the ammunition in March. That is a case you are on. Right. So what follows from that? If he pled guilty to what is charged in the indictment, then there isn't any constructive amendment of the indictment. Well, there is a constructive amendment, we argue, because the indictment is then amended, amended at the time of the preparation. Well, the government says, oh, no, we meant August 31st. So now the – August whatever. So now is what we're actually saying, that the shooting is not relevant conduct to the crime that he pled guilty to, which is some mysterious time when he actually did possess ammunition in March. Of course, it would still be something the Court could consider at sentencing even under that scenario, only it wouldn't go into the guidelines. It would go into 3553A factors. But, yes, the argument is that the record doesn't make clear that what happened on August 31, 2020, is relevant conduct to whatever two grand juries, two sets of grand juries, voted him, charged him. So that's the prejudice. That's the answer to Judge Parker's original question. That, yes. That being prejudice. And that would entitle you to a resentencing at which the Court could consider this shooting under the 3553A factors rather than as relevant conduct. No, you'd have to vacate the conviction. Well, why is that if he pled guilty to what he was charged with? Because the — it's unclear that his guilty plea was knowing and voluntary, because he's pleaded guilty to something on a date that's not reasonably near. March 8, 2020 is not reasonably near August 31, 2020. The client is not even mentally ill. Well, that's a whole separate question, actually, whether that's just on or about. We're indulging the assumption that it is not, and that, therefore, the — we have to look through this at a lens which says, if he had said, Judge, I don't know anything about March, but in August I shot a guy, and I think that's what the government actually means. And the judge said, good enough for government work. That's on or about March. Plea accepted. That would be one kind of scenario. But that's not this scenario. This scenario is, he says, I'm guilty of what I was charged with. Yes, Your Honor. He's guilty of possessing ammunition. But March 8 isn't reasonably near, because March 8 — It doesn't have to be near anything. If the government — suppose the government put evidence in the grand jury of some witness who says, I saw this man carrying ammunition and rattling bullets in his hand on March the 8th. And then he's indicted for that. And somehow they maybe deliberately tried to conflate that with the shooting incident. I don't know. We have no idea. You're the one who's assuming exactly what everybody else is assuming, that they meant the August incident. And if they meant the August incident, then we have a whole different set of issues. And if we were to remand counsel to order vacating the plea, your client presumably could be charged with attempted murder on the correct date. No, because it wouldn't be a federal crime. Well, I guess, yeah. He's thought to be charged with possession of a weapon. Well, yeah. He would be able to be charged with not attempted murder, but with whatever you could charge him. You're right, Your Honor. Excuse me. Your Honor, I do assume it was a mistake. The problem is what I assume is just not part of the record. You just have this record that I've never seen anything like this before. And March 8th is not any date. That's a week. That's a Sunday before the national emergency. I don't know why he was doing March 8th. Counsel, counsel, the complaint had the correct date, right? When he was first arrested on a complaint, it had the correct date, correct? The complaint had the correct date. He understood he was being arrested and charged in connection with this crime that occurred on August, in August, correct? Yeah, the record would indicate that. So it's not a situation where he is charged by indictment, pleads guilty to something in March, and no one's ever mentioned, hey, you're being arrested. This is what you're being charged with in connection with this incident, correct? But the pleadings are a grand jury indictment. The indictment comes down 10 days later, 11 days later, and it changes the date. Yeah, one set of grand jurors in October of 2020 come up with this March 8th date. It's October 13th. October. What did I say, March? No, no, I'm sorry. October 13th. Yeah, October 13th. And then in February, the superseding document. But these are two separate grand juries, and they died him for something on March 8th, 2020. I'm just saying that on this record, a record I've never seen before, anything like this, there's a, it doesn't show that whatever he was indicted for on March 8th, whatever those grand juries, two sets of grand juries he was indicted for, is the same thing as August 31st, 2020. And we are here on claim error because counsel didn't object, didn't contest it, because probably made the same assumption we all made. But just looking at the record, and we have a record that also has a very mentally ill client who is very poorly educated, never been able to hold a job. It's unclear what he understood. Like, all the smart people in the courtroom, the well-educated judge, well-educated prosecutor, the very well-educated defense lawyer, well, they think something. But what is this poorly educated person, who has a very low literacy level, and has extraordinarily little? Thank you. One last question. He has been consulted, and he wants to have the plea undone and to go back and possibly face trial. Oh, I've consulted him. And I am continuing to consult him. So he is making a reasoned decision to pursue this appeal, and knowing that the consequence is he would still be chargeable, or even charged, I'm not sure how we're going to figure this out, with the very crime that he previously pled guilty to. I've previously spoken to him, and I am now, I have a letter out to him, discussing with him a little bit more. And after preparing for this argument, I'm going to write another one. I'm not trying to invade any attorney-client privilege. I just want to be confident that the defendant is the one choosing to pursue this appeal. So far. So far. But I've sent him a letter, and I'm going to send him another letter, reciting what I discussed with him. Counsel, and I think that's what I was trying to get to with my earlier comment about your client. Things could be worse than a wrong date for your client, if we were to follow what you were advocating, which was vacating a conviction and sending the case back. Yes, ma'am. Yes, ma'am. Counsel, counsel, counsel, if I may, please.  You're at 18 minutes, and you have reserved time for rebuttal. We want to hear from your opponents. So you've advised us you'll send or have or will be sending a letter to your client. I take it if you receive instructions, otherwise you would let the government know and the court. But this court will proceed to take this case under advisement. All right? Thank you. We'll hear from you. You have reserved two minutes for rebuttal. Thank you. Thank you. To cut to the chase, rather than address the issue of intent, can we address the date issue, counsel? Of course, Your Honor. And may it please the Court, Micah Ferguson for the United States. I also represented the government in the proceedings below. Why did the grand jury indict him for a crime that occurred on or about March 8th? We're on March 13th, 2020. Yes, Your Honor. Why did the government do that? It was a drafting error. What? It was a drafting error in the indictment. Do you have any affidavit in the record by the person who drafted this? As the assistant that handled the proceedings below, Your Honor, I did not submit an affidavit below. Okay. I did not submit an affidavit below, but, you know, as an officer of the court, I can represent to you that it was a drafting error. Are you? Correct, Your Honor. So a drafting error meaning something like one took a form from a previous indictment for possession of ammunition by a convicted felon, which was some case that happened on March the 8th, whatever date, and didn't notice that the date needed to be changed? Is that the kind of drafting error we're talking about? That is exactly the drafting error, Your Honor. What happened on March 8th? Why was this so prominent in your mind? Was there something else involving Mr. Morgan around March 8th? As I think Judge Lynch was alluding to, the indictment drafted for this case used an indictment from another case that had that March 8th date in it. And while the year was still correct in both cases, the month and day were not updated. The name got changed, but the date remained the same from the form that was being used. That's right. So a boilerplate error. You used the boilerplate, you copied the date, you didn't amend the date. And you did that twice. Exactly. How did it happen the second time? I'm sorry, Your Honor? How did it happen the second time? Because in the interim, you refiled the complaint. That's on January 11th that had the date right. So this is— I mean, I don't want to embarrass you. I'm just trying to figure out what happened here. No, no. I completely understand, Your Honor. So the complaints have the correct date in them. Both the initial and the subsequent one for the co-defendant. To Your Honor's question, why did the subsequent complaint that came in the middle of the indictments have the correct date? The reason is because it used as its starting place the original complaint, which had the correct date. I'm getting all confused. We're dealing with what's arguably the best U.S. attorney's office in the country, right? The office, as it's called. And, I mean, you certainly read these documents before you file them, right? Of course, Your Honor. And, look, there will be some ineluctable human fallibility, even in the best U.S. attorney's office. At least, you know, and even in courts, at least in the so-called lower courts. So I'm trying—just to make the record clear, what you're representing to the court is that the complaint had the correct date. Yes, Your Honor. And then there was an original indictment as to this defendant, and it had the wrong date. And the reason was the boilerplate indictment that was being used for possession of ammunition, that particular case had occurred in March of the same year, and that date was not corrected.  The second—the superseding indictment also copied the original indictment and had the wrong date. But the second complaint against the second defendant copied the original complaint, and it had the correct date. Is that correct? Yes, Your Honor. So my next question is, at the time this defendant pled guilty, in addition to the pimentel letter that Judge Parker raised, what evidence is there in the record, if any, that he understood that when he was pleading to ammunition, possession of ammunition, it was related to this shooting on August 31st? Thank you, Your Honor. I would love to turn to that. So point one is that this defendant was arrested and detained on the original complaint. He is arrested one month later and incarcerated. That complaint is detailed. It sets out the events of what happened. It has still images of the defendant himself committing this shooting. But that's not my question. It gets to, at the time he pled guilty, did he understand he was pleading guilty to this particular shooting? I completely understand, Your Honor. I apologize. It's a roundabout way of getting to it, but I'm endeavoring to get to it. Because the details of the complaint are important. Let me jump to it. The most important detail— Answer her question, and then you can circle back and fill in the blanks. Understood, Your Honor. The most important detail in the complaint, upon which he is arrested and detained, in which he swears in court that he has read and understands and is asked if he would like it read to him, and he says no, is that there were seven shell casings of a particular caliber recovered from that August shooting. Now, it wasn't just that the indictment updated and had correctly the defendant's name. It had the correct shell casings, the correct number, the correct caliber. But you could have shell casings on two dates. Everything was wrong on it. We're not talking about the shell casings. We're not talking about, you know, the street names. This appeal deals with the dates. And so did you handle the plea also? Yes, Your Honor. Were you there? Yes. I mean, Judge Wood even got the plea at the plea colloquy. He got the date wrong, right? Well, he used the date that was listed in the indictment. He said on or about March 8th, right? Yes. And so everybody agreed at that time, which was, you know, more than a year after this case started, that it was March 8th. Why wasn't Judge Wood corrected at the ‑‑ during the plea colloquy? I mean, Your Honor, even I think the inference to draw from the fact that nobody caught this until after the plea is that the date is not an element. And the date was, frankly, inconsequential to this process. Can you answer a simple question? Was the shooting mentioned on the date he pled guilty? Was there any factual recitation given to the court that this charge he's pleading guilty to on or about March 2020 relates to a shooting of these two individuals? Did that occur? Is there anything to connect the two other than the shell casings are the same? Because you could have shell casings, you can possess them at multiple times. Yeah, yes, Your Honor. Okay. The judge asked the defendant if he had received and reviewed the Pimitel letter, which set out the government's view of the guidelines, which was that this was an attempted first‑degree murder. The defendant confirmed that he had. There was no question throughout this entire prosecution that it related to this shooting. Now, no question that there was no question throughout the entire case that this prosecution related to the shooting. But we're asked to take your word for that. It's not to take my word, Your Honor. It's to look at the record, which is clear. The complaint. I mean, the judge told him at the plea that it was March 8th. You told everyone it was March 8th. You don't think, you don't believe that that could possibly be the source of some confusion and misunderstanding? I do not, Your Honor. And I respectfully submit that the record amply supports that there was no confusion. What is a boilerplate complaint? Can you explain what that means? I believe we were sort of discussing a boilerplate drafting error, meaning to draft a new, in this case, a new indictment. You begin with that. At one point you say it's a Scribner's error, and then at another point you say it was a boilerplate indictment. I think boilerplate was Judge Kahn's term, not one that you introduced into this discussion. No, no, no, that's not true. You adopted and made boilerplate your own. So I'd like you just to help me understand, because I agree with your opponent that we've never seen anything like this before. Of course, Your Honor. So often when we are drafting a charging instrument of a particular crime, we will use as our model a prior charging instrument for that same crime. Now, that happened in this case, and unfortunately, and the error is mine, of course. But wouldn't it have a fill-in-the-blank date? No, it's from an actual case, so the date would be filled in already. Not a template, but in fact an indictment from another case. So the date was filled in. That is the source of the March 8th incorrect date. Now, there are many reasons why, notwithstanding this drafting error, and I'm not trying to say. We don't mean to belabor this or embarrass you. We're just trying to find out what happened. I completely understand, Your Honor. It still doesn't meet plain error review. It cannot, and in fact, it can't meet any of the four prompts. I think as Judge Lynch accurately pointed out, if this is a constructive amendment claim, well, there is no disparity between the proof at the plea and what the indictment alleged. Yeah. Second. Well, obviously, it's different from the U.S. v. Bastion case where the defendant was charged with different weapons, different times, so factually different from indictment to plea. But I guess if it's not a constructive amendment, you're saying we should infer from the Pimentel letter. What you have is the Pimentel letter, which talks about what happened here and that that put the defendant on notice. And you first caught this error when you got the PSR? No, Your Honor. You can see this kind of in the fullness of the record with the other co-defendant. The other defendant was charged in the superseding indictment with that same March date. Now, I think a few weeks after Mr. Morgan pled guilty, Mr. Wilder, the co-defendant, attempted to plead guilty at an initial plea proceeding. The plea did not go through, not because of the date. Again, all parties in that prosecution also failed to recognize it at that time, including defense counsel, sophisticated defense counsel. The plea did not go through because that defendant could not allocute or was unwilling to allocute to the fact that he had possessed the shell casings, the ammunition, and instead had, you know, based on discussions and at a plea I believe the following day, allocated to possessing the firearm itself. And he had sufficient knowledge of what the firearm make and model was, which was never recovered, that we could also show that it had traveled in interstate commerce. So when I was preparing for the plea of the co-defendant, Mr. Wilder, to take place the following day, I realized, oh, my God, why is there a March date in this indictment? I updated the date in Mr. Wilder's information, which he pled to the following day, and that had the correct August date. And that's when you sent the letter to probation department correcting the date. And they dropped a footnote in the PSR. Yes, Your Honor. Well, frankly, just in the fullness of the record, just to satisfy, I think, the Court's understandable curiosity of sort of how this happened and what really happened here. We discussed it internally as an office and came to the position that, much like Judge Lynch did, there was no actual difference between the proof and the indictment at the plea. I also discussed it with defense counsel below, who said he didn't believe he did not. I mean, given all the talent at the office, that couldn't have satisfied folks. I mean, you have a very, very talented group that you work with. An explanation like that, I can't imagine that lying in the office. Well, Your Honor, maybe just to complete in fullness of the narrative, at least. I did, although it was never put on the record, I did discuss it with defense counsel, who agreed that Mr. Morgan did not need to replete. And also we determined as long as it was made clear in the record what happened, that would be sufficient. And the pre-sentence report made that abundantly clear. And defense was asked, is there any issue to bring to my attention having to do with the pre-sentence report? And the answer was no. And Judge Wood, Judge Woods, a very careful judge, made an excellent record on that point by instructing, even at the plea, instructing them carefully, the defendant himself, to carefully review the pre-sentence report and bring any issue, any matter of concern to his attention. Well, it's not that careful in the sense that neither you nor defense counsel nor Judge Woods said in the defendant's presence, there is this mistake in the indictment. There is this mistake in what happened at the elocution. Do you now understand, and did you understand then that you were pleading to something that, to this shooting incident? And if you did not, do you want to take back your plea and do it over again here? If that had been done and defense counsel consulted with his client and said, no, we have no objection to proceeding with the sentence, then we would have a clear waiver. But you're still relying on the fact that without explicitly saying so, the fact that the defendant putatively read or admitted to reading the pre-sentence report and had no objection, that that means he did not object to the substitution of the August date for the March date. That's basically the argument. And you're saying that on that understanding, it is not just some failure to object plain error. It's actually a conscious affirmative waiver of any problem because he was asked that, although it could have been asked a lot better, and said, no, let's go forward. I think that is a fair reading of the record, Your Honor, that you could. There's one basis for affirmance here is to say that at the sensing that the defendant Well, there are a lot of bases. You see, I think what we're all struggling with here is that, and I think Mr. Fields is struggling with it, too, that you have to come up with something. This is something none of us has ever seen before. So we're trying to come up with rubrics. And one rubric that's a plausible thing to think about is constructive amendment. I don't think that quite does it, actually. But then his alternative is, how do we know that this was a knowing and voluntary plea? And I think that's the best way to look at this. And I guess you are saying two things. I'm not necessarily saying they're sufficient. But one thing is that we know from the overall circumstances of the case that at least no reasonable person, asterisk maybe Mr. Morgan is not a reasonable person, that no reasonable person would have thought that he was pleading to anything other than what he'd been charged with all throughout in the complaint, that everyone assumed all the way through, that the plea negotiations and the Pimentel letter all said was possessing ammunition and possessing it by shooting it into somebody. Well, not the shell casings. They're what's left over. That's one thing that he must have known at the time. And point two, that by the time of the sentencing, with every opportunity to object, having read the pre-sentence report and knowing that it's really an August thing that he's now going to be sentenced for and sentenced very severely for, he still adhered to I have no objection to anything in the pre-sentence report. And that's what we have to decide. Is that sufficient to let the plea and sentence stand? I think that is largely fair, Your Honor. I would go back to maybe the first statement that Your Honor just made, which is we've never seen this before. To me, that seems very clear that it cannot meet the plain error standard because Well, no, no. There's a lot of things we've never seen before. The reason we've never seen them before is they're so outrageous that, of course, it's plain error. Folks don't make those kinds of mistakes. Well, I mean, it is a lesser version of the mistake in Bastian. Bastian, as Your Honor well knows, having drafted the opinion, involved a completely different type of gun, used on different dates for different purposes, and in different criminal transactions. Well, we can certainly conceive or conjure up more serious mistakes, so we don't want to really lead to this oppression. And, you know, none of us is perfect. Everyone makes mistakes. We're just trying to figure out what the easiest way to get out of this conundrum is. And I understand your argument is that it's not a constructive amendment because it's not like Bastian and that, in essence, this defendant had, based on the entire circumstances, understood the core criminality of what he was pleading guilty to. Is that basically your position, counsel? And if it is, because you're now almost 11 minutes over time, but I want to make sure my colleagues have enough time to ask you all the questions they want to ask you. You didn't touch on intent, and I don't know if my colleagues have questions on that. No. But if not or no further questions, then I would ask you to sum up, counsel, who also went substantially over time. We'll have two minutes for rebuttal. Thank you, Your Honor. This Court exercises plain error review to reverse convictions where there is a manifest injustice. Notwithstanding the drafting error, notwithstanding my own responsibility for that error, there was no manifest injustice in this case. There was no question throughout the entire prosecution that it related to a shooting, a very serious shooting where two people, at least two people, almost died and were killed. There was no issue with the defendant's knowledge of what he was incarcerated for during the prosecution and what he was being prosecuted for. For those reasons and the ones stated in our brief, this Court should affirm. Thank you. Thank you, counsel. Attorney Fields? I know you went over time, but you reserved two minutes for rebuttal, and you may use them, sir. Thank you, Your Honor. Just going back to the point two, I just want to address the harmless error issue because at the end of the sentencing, the judge, the point two concerns the attempted murder enhancement, the attempted murder guideline that was used. I don't think you have anything to rebut on that subject because you argued it at length and the government didn't say anything that you could now rebut. You are correct, Your Honor. So I was going to talk about something I didn't talk about related to that, so I apologize. And as I told the Court, I have a letter out to the client, and I'm going to write another one, and I'm going to sort out very specifically what his intentions are. We did address it earlier in the case, but not in the detail. It might be that nothing worse could happen to him. He got sentenced to the maximum for the crime that he was charged with here. He could still be prosecuted by the State for attempted murder because of the State has a very broad double jeopardy. If it was the other way around, the dual sovereignty would protect him, or it would make it possible for him to be prosecuted. But I guess under New York's double jeopardy rule, he could not now be prosecuted for attempted murder based on this incident. There would be an issue. And practically, he probably wouldn't be prosecuted simply because the victims didn't even put in witness statements. Well, I assume there's a reason why he wasn't prosecuted for attempted murder in the first place. That's right. And the difference is, and the reason why he gets the benefit of a plea with a ten-year maximum sentence rather than one with a 25 to life possible sentence, is that that would involve proof beyond a reasonable doubt. And if the witnesses are reluctant or there are other problems of proof, turning him over to the Feds and getting this charge is actually the worst that could happen. But it's still theoretically there's a chance. Theoretically, the world thinks things are different. Yeah, okay. The particulars, more of the particulars came to my mind in the last week. But we did address it. I've written him last week a little. And counsel, I would only ask that if you are going to, if your client's position regarding this appeal changes, that you let this court know as soon as possible because we will move forward with taking the case under advisement. All right? So it's not being stayed, to be clear. And so I thank both sides for your arguments and for your time and that it concludes our matters for today.